**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BILLY R. SIMPSON, | ) | CASE NO. 10-CV-2033 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| ROBERT WELCH, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Billy R. Simpson ("Simpson"), challenges the constitutionality of his
conviction in the case of *State v. Simpson*, Lucas County Court of Common Pleas Case No. CR-
06-2667.  Simpson, *pro se*, filed his Petition for a Writ of Habeas Corpus (ECF No. 1) pursuant
to 28 U.S.C. § 2254 on September 10, 2010.  On January 25, 2011, Warden Robert Welch
("Respondent") filed his Answer/Return of Writ.  (ECF No. 9.)  Simpson filed a Traverse on
May 31, 2011.  (ECF No. 20.)  For reasons set forth in detail below, it is recommended that
Simpson's petition be DENIED.

**I.  Summary of Facts**

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment
of a state court, factual determinations made by state courts "shall be presumed to be correct."
28 U.S.C. § 2254(e)(1); *see also House v. Bell*, 283 F.3d 37 (6th Cir. 2002).  The state appellate
court summarized the facts underlying Simpson's conviction as follows:

[*P8]  The following relevant evidence was adduced at trial on May 1-4, 2007.
The victim in this case, who was 40 years old at the time of the incident, was
addicted to crack cocaine and living in her parents' home.  On July 16, 2006, the
victim left her parents' home, without their knowledge, and went to Ronald
Porter's house because he always had crack cocaine, or could get some from
appellant, for her and Porter to smoke.  The victim rode a bicycle for five to seven
minutes to Porter's home, which was only a couple of blocks from her parents'
home.  The victim's family believed she was staying at Porter's house, but, at the
victim's request, Porter and appellant lied to the family and told them that the
victim was not there.

[*P9]  The victim testified that she stayed in Porter's home smoking crack
cocaine for three days, never sleeping, until July 19, 2006.  She testified that only
she and Porter were smoking crack cocaine, appellant was not.  During that time,
she, Porter and appellant got along fine.  However, after she smoked $120 worth
of crack cocaine that she did not have the money to pay for, she testified that she
was cut off and appellant became violent.  On the evening of July 19, 2006,
appellant and Porter drove the victim in Porter's pickup truck to a truck stop on
Alexis Road so the victim could make some money, by means of prostitution or
theft, to pay off her debt.  The victim testified that she went into the truck stop to
use the bathroom, but did not want to prostitute herself or steal, so she left the
truck stop and went to a nearby McDonald's.  Porter and appellant drove over to
the McDonald's and picked the victim up near the drive-thru area.  The evidence
was clear that the victim did not want to stay at the truck stop, but was unclear as
to whether the victim wanted to return to Porter's or was forced to do so. n1
Regardless, the three individuals returned to Porter's.

FOOTNOTES

n1 The victim testified at trial that she was forced to get back into the pickup;
however, she had told Jane Reeder, a sexual assault nurse examiner ("SANE") at
St. Vincent Mercy Medical Center, that she suggested that they return to Porter's.

[*P10]  The victim testified that appellant was unhappy and "had an attitude"
about her not getting any money.  At Porter's, both appellant and Porter were
drinking alcohol.  About an hour after returning from the truck stop, Porter
appeared to pass out, fall asleep, or pretend to do one or the other, on the couch in
the living room.  At that time, appellant threatened the victim with a knife and
told her to go upstairs.  The victim testified that the knife had been brought into
the living room by Porter at some point that evening and laid on the coffee table,
where appellant later retrieved it.  A knife was recovered by the police at Porter's
house, laying on the coffee table in the living room.  The victim testified that
Porter never threatened her with the knife, or otherwise, but also did not intervene
when appellant threatened her.

-2-

[*P11]  The victim testified that she went upstairs because she feared for her safety and believed that appellant was going to kill her.  Once upstairs, the victim testified that appellant made her undress in the larger of the two bedrooms and then take a shower.  Wrapped in a towel, the victim testified that she attempted to go downstairs, but appellant told her to get her "ass up there."  The victim then sat in the larger of the two bedrooms while appellant spoke on his cell phone for 10 to 20 minutes.  The victim testified that she thought about trying to run, but did not because appellant was upstairs and Porter was downstairs, and she did not know how she would get past them.  She was also unsure whether the handle on the front door, an antique glass knob, had been removed, which would have prevented her from being able to open the door.  Because she was afraid and did not know what was going on downstairs, she felt that she had no option but to stay and, therefore, she did not attempt an escape. She stated, "If I would have screamed or acted out, it would have come back on me."

[*P12]  After appellant's phone call, the victim testified that he made her go into the smaller of the two bedrooms upstairs.  Appellant told the victim to lie face down on the bed. The victim testified that she struggled with appellant at this point, but that he "attacked" her and "literally tried to snap [her] neck."  She then lay on the bed and he tied her hands and feet to the corner posts of the bed.  The victim testified that Porter did not assist appellant with tying her down and holding her against her will and that, if she told police that Porter held a knife on her while appellant tied her down, she had misspoken, probably due to the fact that "there was so much going through [her] mind and emotions."

[*P13]  The victim's wrists were bound with men's ties and her feet with Velcro straps.  A tie was found by police on the floor by the head of the bed, tied in a "binding knot," rather than a necktie knot, and black Velcro straps were found under the mattress at the foot of the bed.  At the time of the incident, appellant wore a knee to ankle brace that was secured with Velcro straps.

[*P14]  Once bound, appellant retrieved rubbing alcohol from a cupboard in the hallway, poured it over the victim's anal and vaginal areas, and returned the bottle to the cupboard.  A bottle of rubbing alcohol was recovered by the police in the cupboard.  Although the victim did not testify at trial that appellant squirted lotion on her prior to penetrating her, she had told police this fact on the day of the incident and a bottle of lotion was recovered from a table next to the bed where the victim indicated it could be found.

[*P15]  The victim testified that appellant penetrated both her anal and vaginal cavities with his penis, and bit her very hard on her ear.  She estimated that the assault went on for approximately six hours, until early morning.  She was crying, screaming and begging him to stop.  When she would scream, move, or squirm, he would bite her on her back, "like a dog," or punch her, and would tell her not

-3-

to move and that she would "be dead by morning." At trial, the victim did not know whether appellant ejaculated in her, but she believed that he had "whipped" his ejaculate into a wastebasket in the room that had a plastic bag in it. Police recovered a wastebasket liner from the room that had fluoresced, indicating that some substance was present therein; however, no DNA was found on the liner. The victim believed Porter came upstairs at one point, because she saw the hall light under the doorway, but appellant covered her mouth with his hand, and Porter did not intervene.

[*P16] Although appellant did not tell her the assault was about money, the victim testified that the assault ended when she convinced appellant that she could get him $120 from her parents. Appellant made the victim take a shower after the assault and then allowed her to dress. The victim testified that there was a tie around her wrist, but did not recall what she did with it while she was in the shower, although she recalled that the shower was brief. She also could not recall whether appellant was in the bathroom while she showered. The victim testified that she tucked the tie up her sleeve before leaving Porter's and did not attempt to remove it because she did not want to waste the time to get it undone since she "was wanting to get out of there, especially when he was willing to take [her] to [her] parents'." While waiting for appellant to get ready to leave, the victim recalled smoking a cigarette, but did not remember whether she smoked inside or on the porch, or whether anyone was outside.

 [*P17] At approximately 6:00 a.m. to 6:30 a.m., on July 20, 2006, appellant drove the victim in Porter's truck to the victim's parents' home. Appellant stayed right behind the victim when she approached the house. The victim testified that she did not have a key to the front door and, although she approached it, she did not knock because she wanted to get into the house and away from appellant, who was right behind her. The victim went around to the side of the house, with appellant following her, and, because there was no gate through which she could have gone, she went over the six to eight feet tall privacy fence that surrounded the backyard. Appellant stayed on the side of the house. The victim testified that appellant did not choke her while she was alongside her parents' house.

[*P18] The victim entered the house through a sliding glass door, which was not locked. When asked if she intended to give appellant $120, the victim stated, "I was going to my parents' to get the money. But I was -- it was more of a mind game, you know what I mean? I want -- whatever it took for me to get out of that house, I was willing to do that." The victim's brother was asleep in the living room and awoke when she entered the house.

[*P19] The brother testified that the victim told him there was someone on the side of the house. Thinking that it was "just another drug deal gone bad," he went out and told appellant to leave. The brother testified that, within a matter of

-4-

seconds he was back inside and the victim, who was holding her neck, unable to speak, "squeezes out, 'He raped me.'"  Seeing "the look in her face" and the silver necktie hanging from her wrist, the brother testified that he became angry and went outside to confront appellant.  Appellant got into the pickup truck and sped in reverse down the street away from the parents' house.  The brother testified that he never saw appellant choking the victim alongside the house and denied having been awoken by any commotion outside.

[*P20]  The victim testified that she was hysterical when she got home, "crying, balling," and that she had been awake for approximately 96 hours at that point.  She was sore "front and back" and her ear felt "raw" where he had bitten her.  The victim's mother testified that the victim was hysterical, "very shook-up," and was "scared and crying."  The mother testified that the victim had a necktie tied to her right wrist and that the victim told her that she had been sexually assaulted, "tied up for hours," and got away because she knew that the mother would give her money so that "she could pay them off."  The victim testified that her family assisted her with taking the tie off of her wrist.

[*P21]  The police were called and the victim was eventually taken to the hospital where she was interviewed by Jane Reeder, a SANE nurse, and Detective Ron Permar, with Toledo Police Department's Sexual Assault Unit.  With respect to that interview, the victim testified that she did not say that appellant choked her against her parents' house or that she only "pretended" that the front door was locked.  Also in response to defense counsel's questions concerning inconsistencies between the victim's testimony and the statement she gave Reeder, the victim testified that she did not recall Reeder reviewing her notes with her prior to leaving the hospital to give the victim an opportunity to make corrections.

[*P22]  Reeder testified at trial that the victim was triaged at 8:15 a.m. and appeared "very tearful" and "very upset."  When taking the victim's medical history, Reeder stated that the victim told her the following:

[*P23] "She had told me that the night before she had been with a friend of hers, and that they proceeded to hookup with another person.  She states her friend's name was Ron Porter, and that they met up with Ron's friend Billy [appellant] and that they had been together for a while then went to a McDonald's next to a truck stop, where she was told to go in to get money. * * *  She went inside to use the bathroom, came back out and told them no, she wouldn't get any money.  She was supposed to get money from truck drivers.  And then when she didn't, they went -- she wanted to go back to Ron's house, and they went back to Ron's house is what she told me, and that [appellant] had told her to go upstairs and to get undressed."

-5-

[*P24]  The victim also told Reeder about going from one bedroom to another, being tied to a bed, being raped repeatedly anally and vaginally and that, when she resisted, he would bite her.  Reeder testified that, in correlation with the victim's account, "there were round circular marks with bruising in the middle and all the way around" on her back, including the back of her arms.  No bite marks, however, were found on the front of the victim's body.  The victim's ear was "very reddened" and there was "a semi-circular mark around the back of her ear."  No fluids were found on the victim's body; however, Reeder testified that the victim had indicated that she was told to shower, "[s]o it's possible that if there was fluid it was washed off."  Nevertheless, swabs were done on the victim's earlobe, vagina and rectum, for DNA analysis.

[*P25]  Reeder testified that the victim had "multiple tearing," *i.e.*, more than two or three tears in the skin around her anus, and was experiencing a great deal of pain in that area.  Reeder stated that the tears were not consistent with the presence of hemorrhoids in that area.  Reeder also testified that the victim had "a sizeable bruise on her cervix," which could be caused by penile penetration, "but it would be awfully rough to cause that type of bruising."  Reeder found multiple tears at the base of the vaginal opening which were similar to the tears around the anus, "paper-cut-type tearing," and there was a bloody discharge in the victim's vaginal area, which Reeder believed to be caused by the trauma in that area.

[*P26]  Reeder further testified that the victim had purplish-red marks around her neck.  Reeder stated that the victim told her that, at one point, when she was taken home and tried to run, "her assailant choked her, put his hands around her throat, which correlates with the red marks that would be on her throat."

[*P27]  On cross-examination, Reeder acknowledged that, even with consensual sex, trauma could occur, depending on the length of the sexual activity and the size of the man's genitalia.  Other matters highlighted by the defense included the fact that (1) the victim asked to return to Porter's when leaving the truck stop; (2) the victim never mentioned being threatened with a knife; (3) the victim told Reeder that appellant had ejaculated inside her and then finished in his hand and put the fluid in a wastebasket; (4) the victim only told Reeder about having taken one shower, not two; (5) the victim told Reeder that appellant sat in the bathroom, "on the toilet," while she showered; (6) the victim told Reeder that she put some soap on the shower floor in hopes that "if the perpetrator got into the shower with her or after her, he might slip on the soap" so she could try to get away; (7) the victim never mentioned having the tie around her wrist while she was in the shower and, instead, told Reeder that she took the tie and put it in the pocket of her shorts before leaving; and (8) the victim told Reeder that she "pretended" that the front door was locked before going around to the side of the house, where she was then choked by appellant.  Reeder also testified on cross-examination that before the victim left the hospital, after being there over four hours, Reeder read

her notes back to the victim to make sure that she understood what the victim was telling her. Reeder testified that the victim made no corrections to her verbal recitation of the facts. The victim never was given an opportunity to review Reeder's written report.

[*P28] Gabriel Felter, with the State of Ohio Bureau of Criminal Identification and Investigation, testified that saliva was found on the swab taken from the victim's ear, and that her underwear, vaginal swab, and rectal swab, were all positive for semen. Linsey Hail, also with the State of Ohio Bureau of Criminal Identification and Investigation, testified that the DNA results from the vaginal swab and ear swab were consistent with appellant's DNA profile.

[*P29] Officer John Mattimore, Toledo Police Department, and Officer Troy Meyers went out to the parents' home on the morning of July 20, 2006. Mattimore interviewed the victim and her brother, but Meyers heard some of the interview conducted. Mattimore described the victim as "physically and emotionally drained, like she was really tired." He also testified that she had red marks around her neck, bruising about her body, and she was "moving very slowly, having a hard time talking to me and getting around." Mattimore testified that it seemed like the victim was "having a hard time getting things out."

[*P30] As a result of the interview, Mattimore and Meyers testified that they believed the victim had been smoking crack cocaine with both suspects over a three-day period, that the suspects would not allow her to leave, and that they still wanted their money from her after the rape. The officers also believed that appellant choked the victim against her parents' house and that her brother came outside after hearing noises from the choking commotion. Mattimore testified that the victim's brother was holding the tie, but that Mattimore never touched it, so he did not know whether it was wet.

[*P31] Mattimore testified that the victim's brother and father were yelling during the interview for the police to go arrest the suspects. Mattimore also testified that he did not take notes contemporaneously while being told facts about the incident, but jotted notes down afterwards. On redirect, Mattimore testified that he assumed that the victim meant that both guys smoked crack with her when she told him that "we smoked crack cocaine," although she never specifically indicated such. Mattimore also testified that he did not ask any specifics about who, or at what time, prevented her from leaving, but had only specifically asked her who had raped her.

[*P32] Detective Permar was then called by the state and testified that he interviewed the victim at the hospital on the day of the incident. Before questioning the victim, Permar told her that she needed to be as accurate as she could. The victim told him that she had been at Porter's house since Sunday,

most of the time with Porter, but that Simpson was in and out.  On July 19, 2006, appellant arrived at Porter's house around 10:00 p.m. and discussed the money that the victim owed for the drugs she had used during her stay.  Prior to appellant's arrival, the victim told Permar that money had never been mentioned. The victim told him that the men took her to Petro, a truck stop, on Alexis Road, wanting her to either prostitute herself or steal from the truckers.  She told Permar that she was forced to be there, but that she neither prostituted herself nor stole money.  The men then got her back into the truck over by McDonald's and took her back to Porter's home in Point Place.

[*P33]  The victim told Permar that, upon their return to Porter's around 11:00 p.m., appellant was still angry about the money that was owed and that he forced her upstairs while Porter pretended to be passed out on the couch.  The victim told Permar she complied with his demands because she feared for her safety. Appellant told her to go in the big bedroom, where he had her undress, and then appellant got a phone call.  Permar testified that the victim did not tell him that she was made to shower prior to the assault.  The victim indicated that "at some point she wanted to leave the room," but appellant "kind of made a gesture that she was to sit back down."  He then took her into the smaller bedroom and told her to lie on the bed and that, when she resisted, he became more angry and forced her to lie down and proceeded to tie her hands and feet to the rails of the bed.  The victim then described for Permar appellant's use of rubbing alcohol, lotion, and the penile penetration, both anally and vaginally.  Throughout the assault, the victim told Permar that she begged appellant to stop, but that he would threaten her family and comment on the money she owed.  She told Permar that it ended when appellant ejaculated and threw his ejaculate into the trash can, which was in the room off to the side of the bed.

[*P34]  According to Permar, in order to get away, the victim told appellant that she could get the money from her parents' house.  Appellant agreed, untied her, and forced her back into the shower area, where he also cleaned himself.  She dressed and he drove her to her parents' house.  Once there, when she couldn't get into the front door, she felt that "if she jumped their privacy fence at the house it would provide her distance to get away from [appellant]."  Once inside, she stirred her family and appellant fled in Porter's vehicle.

[*P35]  Police knocked on Porter's door for four hours, but no one answered the door or left the premises.  At 11:00 a.m., Permar obtained a search warrant.  After gaining access to the house, Permar testified that he saw "a large knife sitting right by where [appellant] was sitting on the couch."  No drugs or drug paraphernalia was found in the house, but rubbing alcohol was found in the hall closet and lotion was found in the small bedroom, both where the victim indicated they could be found.  A man's tie and Velcro straps were also found in the smaller bedroom, where the victim had told Palmer the assault took place.  Permar did not

-8-

recall asking the victim if any weapon had been used during the assault and was not aware that the victim had told police that a knife had been used until several days later.  He never followed up with the victim regarding the use of a knife. Permar testified that he did not seek to have the knife checked for fingerprints because the presence of fingerprints would only have established who touched the knife, not whether it was used to threaten the victim, and the police already knew that appellant and Porter both had access to the knife.

[*P36]  Permar interviewed appellant on July 20, 2006, regarding the allegations. Appellant stated that he never had sex with the victim, consensual or otherwise and did not do any of the things the victim told the police had occurred, such as, forcing her to shower, pouring rubbing alcohol on her, or putting lotion on her. Appellant, however, did tell Permar that the victim owed him and others money from stealing or smoking other people's crack cocaine.  He said that the victim was always saying how she was going to get money, but that she never followed through.  Appellant told the victim that if she wanted to make a quick $200, he knew where she could go and then they could "party."  He and Porter took the victim to the Petro truck stop to have her prostitute herself or steal, but appellant stated that the victim was afraid or embarrassed because the Petro guy saw her and she left.  She went over to the McDonald's and appellant stated that he decided they should all just leave.

[*P37]  When they returned to Porter's, appellant said that he went to sleep in the larger bedroom around 1:00 a.m., or later, and that he caught the victim around 6:30 a.m. going through the pockets of his shorts.  He believed that she had previously taken $120 during the night and had come back looking for more money.  He said that he pinned her down with his forearm on the back of her neck and that he bit her ear and back a couple of times out of anger.  He asked her if the money was in the house and said that she indicated it was in her bedroom at home and that she could get it for him.  He surmised that she must have left with his money, gone home to her parents' to hide the $120, and then returned to Porter's. He said he didn't care where she got his money from, he just wanted it back.

[*P38]  Appellant told Permar that he got up and took the victim to her parents' home.  The victim tried the front door, but couldn't get in, so she went around to the side of the house and went over the privacy fence.  The victim's brother then came out the front door, followed by the victim, and yelled at appellant. Appellant presumed that the victim's brother acted in such a manner because he was prejudiced against black people.  Appellant then left and returned to Porter's, where he went upstairs to go back to sleep in the larger bedroom.  He heard loud knocking on the door, but did not answer the door because it was Porter's house. He denied telling Porter at any point not to open the door.

-9-

[*P39]  Following Permar's testimony, the state rested and the defense called Detective Michael Riddle, Toledo Police Department, who testified that he spent approximately five minutes speaking with the victim on the morning of July 20, 2009.  From talking with the victim, Riddle believed that the victim had been smoking crack cocaine with both men, not just Porter, that Porter held the knife on her while appellant tied her up, that appellant choked her against the side of her parents' house, and that the victim's bother saw appellant choking her through a window.  Riddle testified that his interview was cursory, he took "very limited notes," and did not write his report until seven days after the incident.  Although he could not recall whether he told Permar about the knife on the morning of July 20, 2006, he included it in his report as he specifically recalled the victim saying that the white guy held the knife while the black guy tied her up.

[*P40]  Defense recalled the victim on direct and reviewed with her the grand jury transcript from July 28, 2006, wherein she implicated Porter in the assault with the following statements:

[*P41]  "Then we went over back to their house and they held a knife to me and told me to go upstairs."

[*P42]  "Ron had the knife and then Billy had the knife, they switched -- exchanged basically."

 [*P43]  "They wanted me to go upstairs and undress."

[*P44]  "And then Billy -- Billy slammed me down on the bed and they did my arms."

[*P45]  When asked if Porter held her or held a knife to her while appellant tied her up, the victim stated, "He probably -- well, then later then he ended up coming upstairs and they body slammed me to the bed -- * * * -- both of them."

[*P46]  Although the victim made the above statements during her testimony to the grand jury, she also specifically testified before the grand jury that appellant, not Porter, forced her on the bed and tied her up; that Porter was downstairs, pretending to sleep, when she was forced on the bed and tied up; that Porter held the knife on her after they returned from the truck stop, but only appellant forced her to go upstairs; and that Porter never came upstairs until some point during the night when she saw the hallway light underneath the bedroom door.

[*P47]  When questioned about these inconsistencies, the victim testified at trial that, although she said those things, she "had things going through [her] mind," and she was "emotionally, physically and mentally disturbed by him."  Upon being examined by the state, the victim testified that prior to giving her trial

-10-

testimony, no one had reviewed her grand jury testimony with her and she testified to the best of her memory. The victim also testified that when she spoke to the grand jury on July 28, 2006, she was still using crack cocaine. She testified that she only had a ninth grade education, had trouble reading, and, although she knew the difference between saying "he" and "they," she sometimes was lazy with the use of her pronouns. She clarified that when she said, "[a]nd then Billy slammed me on the bed face down" and 'they did my arms," she did not mean that both Porter and appellant tied her, she was actually talking just about appellant.

[*P48] The defense also called Porter's neighbor, Catherine Cooper, who testified that she typically left her house between 5:20 a.m. and 5:30 a.m. to go to work. On July 20, 2006, when she came out to get into her car, she noticed the victim sitting on Porter's front step, alone, smoking a cigarette. When she pulled away in her car, she did not recall making eye contact, but she was approximately ten feet from the victim and did not notice anything in her demeanor that made Cooper think she needed assistance. Cooper knew who the victim was, but did not know her personally. Cooper testified that she noticed that the victim had been wearing the same blue jean shorts and yellow sleeveless shirt the entire time the victim was at Porter's house that week.

*State v. Simpson*, 2009 Ohio App. LEXIS 3906, 2009-Ohio-4599 at ¶¶8-48 (Ohio Ct. App., Sept. 4, 2009).

## II. Procedural History

### A. Conviction

During its May 2006 term, the Lucas County Grand Jury charged Simpson with one count of rape in violation of Ohio Revised Code ("O.R.C.") § 2907.02(A)(2) & (B), and one count of kidnapping in violation of O.R.C. § 2905.01(A)(4). (ECF No. 9-1, Exh. 1.) After a jury trial, Simpson was found guilty as charged. On June 13, 2007, the trial court sentenced Simpson to consecutive terms of seven years imprisonment for the rape conviction and five years imprisonment for the kidnapping conviction. (ECF No. 9-1, Exhs. 3 & 11.)

### B. Direct Appeal

On July 10, 2007, Simpson, through counsel, filed a timely Notice of Appeal with the

-11-

Court of Appeals for the Sixth Appellate District ("state appellate court").  Simpson raised the

following assignments of error:

1. Simpson's convictions for kidnapping and rape were against the manifest weight of the evidence.

2. Simpson's convictions were not supported by competent and sufficient evidence so the trial court erred by not granting his Rule 29 motion.

3. The trial court erred when it did not require Simpson's co-defendant, against whom charges were nolled by the state, to testify at least to limited yet significant matters that could not have incriminated him.

4. Simpson's 5th Amendment right to due process of law and 6th Amendment right to compulsory process were violated because the state wrongfully threatened the former co-defendant that he could still be charged if he testified on behalf of Simpson.

5. The trial court abused its discretion and prevented Simpson from receiving a fair trial by removing Simpson from the courtroom during *voir dire*, and by not dismissing the jury panel as requested when one of the jury panel stated that Simpson was incarcerated.

(ECF No. 9-1, Exh. 8.)

On September 4, 2009, the state appellate court affirmed Simpson's conviction.[1]  (ECF No. 9-1, Exh. 12.)

On March 15, 2010, Simpson, *pro se*, filed a motion for delayed appeal and notice of appeal with the Supreme Court of Ohio.  (ECF No. 9-1, Exhs. 13 & 14.)  On May 5, 2010, the motion for delayed appeal was denied and his appeal dismissed.  (ECF No. 9-1, Exh. 15.)

---

[1] On June 9, 2009, the state appellate court, *sua sponte*, found that the trial court failed to comply with Ohio Criminal Rule 32(C) by not stating the manner in which Simpson was convicted.  (ECF No. 9-1, Exh. 10.)  The matter was remanded to the trial court for a revised sentencing entry, which the trial court entered on June 11, 2009.  (ECF No. 9-1, Exh. 11.)

## C.  Application to Reopen Appeal

On December 3, 2009, Simpson, *pro se*, filed a motion to reopen his direct appeal alleging

ineffective assistance of counsel and raising the following proposed errors:

1. Appellate counsel was ineffective for failing to raise trial counsel's deficient performance in failing to object and otherwise compel the trial court to accord Mr. Simpson the protections of R.C. §2941.25(A), as well as his constitutional guarantee against double jeopardy.

2. Appellate counsel was ineffective for failing to raise the trial court's abuse of discretion in entering a judgment of conviction in violation of §2941.25(A), as to both appellant's kidnapping count [and] rape count.

3. Appellate counsel was ineffective for failing to raise trial counsel's failure to object to the trial court's abuse of discretion in entering a judgment of conviction in violation of §2941.25(A) [and] the 5th Amendment constitutional guarantee against double jeopardy, as to both appellant's rape count [and] kidnapping count.

(ECF No. 9-1, Exh. 16.)

On January 9, 2010, the application to reopen was denied.  (ECF No. 9-1, Exh. 17.)

On March 6, 2010, Simpson, *pro se*, filed a notice of appeal with the Supreme Court of

Ohio challenging the denial of his application to reopen.  (ECF No. 9-1, Exh. 18.)  Simpson

raised the following propositions of law:

1. The 5th Amendment U.S. Const. Guarantee [and Article 1 §10 of the Ohio Const. Guarantee] against double jeopardy is violated by appellant's two judgments of conviction & two separate sentences for one crime.

2. The 6th Amendment U.S. Const. Guarantee [& Article 1 §10 of the Ohio Const. Guarantee] to effective assistance of counsel is violated by trial counsel's failure to object & compel the trial court to accord appellant his 5th Amendment U.S. Const. Guarantee against double jeopardy [and §2941.25(a)].

3. The 6th Amendment U.S. Const. Guarantee [& Article 1 §10 of the Ohio Const. Guarantee] to effective assistance of counsel is violated by appellate counsel's failure to raise [on direct appeal] a clear violation of appellant's

-13-

U.S. & Ohio Const. Guarantee(s) against double jeopardy [and §2941.25(a)].

    4.    Appellant is denied his 5th & 14th Amendment U.S. Const. Guarantees to Due Process & Equal Protection of the law by the trial court's abuse of discretion in entering a judgment of conviction as to both appellant's kidnapping count & rape count in violation of the 5th Amendment [and §2941.25(a)].

(ECF No. 9-1, Exh. 19.)

On May 26, 2010, the appeal was dismissed as not involving any substantial constitutional question.

**D.    Federal Habeas Petition**

On September 10, 2010, Simpson filed a Petition for Writ of Habeas Corpus and asserted the following grounds for relief:

Ground One: The 5th Amendment U.S. Const. Guarantee [and Article 1 §10 of the Ohio Const. Guarantee] against double jeopardy is violated by appellant's two judgments of conviction & two separate sentences for one crime.

Ground Two: The 6th Amendment U.S. Const. Guarantee [& Article 1 §10 of the Ohio Const. Guarantee] to effective assistance of counsel is violated by trial counsel's failure to object & compel the trial court to accord appellant his 5th Amendment U.S. Const. Guarantee against double jeopardy [and §2941.25(a)].

Ground Three: The 6th Amendment U.S. Const. Guarantee [& Article 1 §10 of the Ohio Const. Guarantee] to effective assistance of counsel is violated by appellate counsel's failure to raise [on direct appeal] a clear violation of appellant's U.S. & Ohio Const. Guarantee(s) against double jeopardy [and §2941.25(a)].

Ground Four: Appellant is denied his 5th & 14th Amendment U.S. Const. Guarantees to Due Process & Equal Protection of the law by the trial court's abuse of discretion in entering a judgment of conviction as to both appellant's kidnapping count & rape count in violation of the 5th Amendment [and §2941.25(a)].

(Doc. No. 1.)

### III.  Exhaustion and Procedural Default

**A.    Exhaustion Standard**

State prisoners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered moot:  "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts."  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 347, 349 (6th Cir. 2001).

**B.    Procedural Default Standard**

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). A claim may become procedurally defaulted in two ways. *Id.*  First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court.  *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate

-15-

grounds for precluding relief, the claim is procedurally defaulted.[2] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).  This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review.  *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon

---

[2]  In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted.  785 F.2d at 135.  Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice."  *Id*. at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002).

-16-

federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d at 138-39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id.* Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (*citing Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

**C.   Analysis**

Respondent argues that Simpson's first, second, and fourth grounds for relief are procedurally defaulted. First, Respondent asserts that grounds one and four are procedurally defaulted due to Ohio's contemporaneous objection rule. (ECF No. 9 at 17.) Second,

-17-

Respondent avers that grounds one, two and four were not raised on direct appeal before the state appellate court.  *Id.*  Finally, Respondent also argues that grounds one, two and four are procedurally defaulted for the additional reason that they were not fairly presented to the Supreme Court of Ohio on direct appeal.  *Id.* at 17-18.  In the interests of brevity, the Court will only address Respondent's final argument.

Simpson filed a motion for delayed appeal and notice of appeal with the Supreme Court of Ohio on March 15, 2010.  (ECF No. 9-1, Exhs. 13 & 14.)  His motion attempted to explain why his appeal was not timely, but did not list the issues he would raise if his delayed appeal was allowed.  *Id.*  On May 5, 2010, the Ohio Supreme Court denied Simpson's motion for a delayed appeal.  (ECF No. 9-1, Exh. 15.)

Simpson, on direct appeal, clearly failed to complete a full round of review when he did not timely appeal to the Ohio Supreme Court.  Ohio Supreme Court Rule § 2(A) requires that an appeal be perfected within 45 days from the entry of the judgment being appealed and failure to do so "divest[s] the Supreme Court of jurisdiction to hear the appeal."  Simpson's appeal was filed long after the 45 day deadline, which is undoubtedly why he sought leave to filed a delayed appeal.  Though the Ohio Supreme Court Rule II § 2(A)(4) does allow a felon to seek to file a delayed appeal after expiration of the deadline, it is within the Supreme Court's discretion whether it chooses to hear the appeal, and it only does so if its finds adequate reasons for delay. Here, there can be no doubt that the Ohio Supreme Court actually enforced its procedural rule requiring appeals to be perfected within 45 days by denying Simpson's  motion to file a delayed

-18-

appeal.[3]  The Sixth Circuit has recognized that a refusal by the Ohio Supreme Court to hear a delayed appeal amounts to an adequate procedural bar precluding habeas review.  *See Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004) (Ohio Supreme Court's denial of appellant's motion for leave to file a delayed appeal constitutes a procedural ruling sufficient to bar federal court review of his habeas corpus petition) (*citing Shabazz v. State of Ohio*, 1998 U.S. App. LEXIS 13444, *3 (6th Cir. June 18, 1998) (unpublished) (The petitioner procedurally defaulted his claims because he did not timely appeal to Ohio Supreme Court and the Ohio Supreme Court denied his motion for delayed appeal)); *Hall v. Huffman*, 2000 U.S. App. LEXIS 25956 (6th Cir. Oct. 11, 2000) (unpublished); *Barkley v. Konteh*, 240 F. Supp.2d 708 (N.D. Ohio 2002). Although Simpson later raised grounds one, two and four before the Ohio Supreme Court upon appeal from the denial of his application to re-open, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Engle*, 456 U.S. at 125 n. 28. Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id*.

Though Simpson's claim is procedurally defaulted, a federal court may consider a petitioner's procedurally defaulted claims if the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  *See Teague*, 489 U.S.

---

[3]  Simpson only averred that his convictions were not supported by the evidence.  (ECF No. 9-1, Exh. 14.)  However, the Ohio Supreme Court's rules clearly contemplate a two-step process in delayed appeals, as Rule § 2(A)(4)(c) states that a memorandum in support of jurisdiction should only be filed *if* the Supreme Court grants the motion to file a delayed appeal.  Thus, it cannot reasonably be argued that the Supreme Court's denial was based on the merits, as that court was not apprised of the issues Simpson wanted to raise.

at 298-99; *Coleman*, 501 U.S. at 750.   Simpson has not set forth any cause for his default.  He does appear to argue, however, that he is actually innocent.  (ECF No. 20 at 7.)  A petitioner's procedural default may indeed be excused where a petitioner is actually innocent in order to prevent a "manifest injustice."  *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).  However, conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995)*;  See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D. Ohio 2007).  Simpson points to "evidence," which may, if obtained, prove his alleged innocence – testimony of his former co-defendant, new forensic analysis of DNA, and expert testimony as to the cause of the victim's injuries.  (ECF No. 20 at 7.)  To satisfy the *Schlup* standard, a petitioner must present new reliable evidence – speculation that such evidence might exist is insufficient.

Therefore, it is recommended that grounds one, two, and four be dismissed as procedurally defaulted.  Nonetheless, a review of ground three on the merits necessarily involves consideration of whether the defaulted claims regarding double jeopardy were viable, and, therefore, whether it should have been raised by counsel in state court.

### IV.  Review on the Merits

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any

-20-

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002)).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413. By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, a federal district court

must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions."  *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

## A. Ground Three: Ineffective Assistance of Appellate Counsel

In ground three, Simpson alleges that his appellate counsel was ineffective for failing to raise a double jeopardy argument in any of the assignments of error during his direct appeal. (ECF No. 1.)

To establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985).  A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair.  *Id*.  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory."  *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

Claims of ineffective assistance of appellate counsel are also subject to the *Strickland* test. *See Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993).  Counsel must provide

-22-

reasonable professional judgment in presenting the appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986), *quoting Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). However, failure to raise "significant and obvious" issues on appeal can constitute ineffective assistance of appellate counsel. *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999). Nonetheless, no decision of the Supreme Court "suggests ... that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U S 745, 750-54 (1983); *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990) (tactical choices are properly left to the sound professional judgment of counsel). Failure of appellate counsel "to raise an issue on appeal is ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005), *citing Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001).

The state appellate court analyzed Simpson's ineffective assistance of counsel claim under the *Strickland* test, and, therefore, applied the correct legal standard. (ECF No. 9-1, Exh. 17 at 2.) As such, the only issue is whether the state appellate court unreasonably applied the *Strickland* test or whether the decision was based on an unreasonable determination of the facts in light of the evidence presented. In addressing Simpson's assignment of error, the state appellate court found that rape and kidnapping are indeed "allied offenses." *Id*. at 4. Citing *State v. Logan*, 397 N.E.2d 1345, 60 Ohio St.2d 126 at the syllabus (Ohio 1979), the state court

observed that double jeopardy was not implicated if the two crimes were committed with a

"separate animus."  *Id*.  The state appellate court found that the two crimes were committed with

a separate animus and explained as follows:

> In this case, the victim was threatened with a knife and made to go upstairs. The
> victim testified that she went upstairs because she feared for her safety and
> believed that appellant was going to kill her. Once upstairs, the victim testified
> that appellant made her undress in the larger of the two bedrooms and then take a
> shower.  Wrapped in a towel, the victim testified that she attempted to go
> downstairs, but was stopped by appellant.  The victim was made to sit in the
> larger of the two bedrooms while appellant spoke on his cell phone for 10 to 20
> minutes. After appellant's phone call, the victim testified that he made her go into
> the smaller of the two bedrooms upstairs, where appellant bound and raped her.
>
> Upon review, we find that, although appellant restrained the victim during the act
> of rape, the overall restraint imposed by appellant upon his victim was prolonged
> and substantial and was significantly independent of the rape offense.
> Accordingly, we find that, although rape and kidnapping are allied offenses,
> appellant's conduct constituting the rape and kidnapping was committed with a
> separate animus and, therefore, appellate was properly convicted of both offenses.
> See R.C. 2941.25(B).

(Exhibit 17, pp. 4-5).

The Double Jeopardy Clause of the 5th Amendment to the United States Constitution, which

was made applicable to the states through the 14th Amendment, states that no person shall "be

subject for the same offence to be twice put in jeopardy of life or limb."  This clause protects

criminal defendants not only from successive prosecutions for the same offense, but also from

multiple punishments for the same offense.  *See Brown v. Ohio*, 432 U.S. 161, 165 (1977).  In

*Blockburger v. United States*, 284 U.S. 299, 304 (1932), the Supreme Court established the

"same elements" test, which requires courts to determine whether a charged offense "requires

proof of an additional fact which the other does not."  As the Court understands Simpson's

argument, he believes his right to be free from multiple punishments for the same offense has

been violated.

The Court finds that the state appellate court's finding – the rape and kidnapping charges do not violate the double jeopardy clause because each conviction has a separate animus – is not an unreasonable application of clearly established federal law or unreasonable in light of the facts presented. *See, e.g., Thomas v. Brunsman*, 2008 U.S. Dist. LEXIS 118323 (S.D. Ohio, Nov. 5, 2008) ("because the rape and the kidnapping each had a separate animus, the Ohio Court of Appeals' adjudication of petitioner's double jeopardy claim was neither contrary to nor involved an unreasonable application of clearly established federal law as determined by the Supreme Court in addressing double jeopardy 'multiple punishment' violations and was reasonable in light of the evidence presented at petitioner's state criminal trial."); *Spence v. Sheets*, 675 F. Supp. 2d 792, 825 (S.D. Ohio 2009) (finding the state court's conclusion that evidence reflected separate criminal acts due to the prolonged restraint and movement of the victims did not violate the Double Jeopardy Clause); *McKitrick v. Smith*, 2009 U.S. Dist. LEXIS 35638 (N.D. Ohio April 21, 2009) (trial court's finding that petitioner had "separate animi" for robbery and kidnapping is due deference in habeas proceedings and therefore petitioner's convictions did not violate *Blockburger*). The facts corroborate the state court's finding that Simpson restrained the victim for a prolonged and substantial amount of time, and was significantly independent of the actual rape offense. The testimony also indicated that Simpson was angry and believed that the victim owed her money. Thus, the kidnapping was also motivated by and arguably calculated to coerce the victim into recovering money owed to Simpson.

Finally, because Simpson's underlying double jeopardy claim is without merit, it cannot

-25-

reasonably be argued that appellate counsel was not ineffective for failing to raise a meritless

claim upon direct appeal.  In fact, under such an analysis, all four of Simpson's claims would fail

on their merits.

### V.  Motion for Discovery

On July 27, 2011, long after this matter was fully briefed, Simpson filed a Motion to

Compel Full Discovery.  (ECF No. 21.)  Respondent filed a brief in opposition.  (ECF No. 22.)

This Court previously denied a similar motion on May 2, 2011.  (ECF No. 18.)  For the reasons

stated therein, Simpson's new motion is hereby DENIED.

### VI.  Conclusion

For the foregoing reasons, it is recommended that Simpson's Petition be DENIED.

/s/ Greg White
U.S. MAGISTRATE JUDGE


Date: September 20, 2011



### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**